UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

BRIDGET CARADORI, *Individually and as Personal Representative of Patricia Daley, Deceased*, and
ROBERT L. DALEY,

    Plaintiffs,

v.

KARL STORZ ENDOSCOPY–AMERICA, INC. and
KARL STORZ GMBH & CO., KG, *Organized in Germany*,

    Defendants.

Civil Action No. TDC-14-3198

## MEMORANDUM OPINION

In February 2011, Patricia Daley underwent a robot-assisted hysterectomy for the treatment of uterine fibroids at Holy Cross Hospital in Silver Spring, Maryland. The surgeon used two power morcellators to remove her uterus and fibroids, one of which was a Karl Storz Rotocut G1 Morcellator, manufactured by Defendant Karl Storz GMBH & Co., KG ("KST") and sold to the hospital by Defendant Karl Storz Endoscopy–America, Inc. ("KSEA"). Use of the morcellators allegedly resulted in the dissemination of a leiomyosarcoma cancer throughout Daley's abdominal cavity. That cancer ultimately led to her death. Plaintiffs Bridget Caradori, Daley's sister, and Robert L. Daley, Daley's father, then filed this negligence, products liability, and wrongful death action against Defendants KST; KSEA; and Ethicon Endo-Surgery, Inc., d/b/a Ethicon Women's Health and Urology ("Ethicon"). At issue is whether this Court has

personal jurisdiction over KST. For the reasons set forth below, KST's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.

## BACKGROUND

### I. Procedural History

This case was originally filed in the Circuit Court for Montgomery County, Maryland in July 2014. After Ethicon removed the case to this Court, KST moved to dismiss Plaintiffs' claims for lack of personal jurisdiction. Plaintiffs' opposed the motion or, in the alternative, requested jurisdictional discovery. On June 24, 2015, the Court denied KST's motion without prejudice and granted Plaintiffs' request for jurisdictional discovery. Based on that discovery, Plaintiffs' amended their Complaint. On October 19, 2015, this case was transferred to the United States District Court for the District of Kansas as part of multi-district litigation relating to the claims against Ethicon. After those claims were resolved, the case was returned to this Court for resolution of the claims against KST and KSEA. While Plaintiffs' claims against KSEA have proceeded to discovery, KST has renewed its Motion to Dismiss for Lack of Personal Jurisdiction.

### II. Jurisdictional Facts

Defendant KST manufactures Karl Storz morcellators. KST is a privately-held company organized in Germany with its principal place of business in Tuttlingen, Germany. KST does not have employees, offices, real estate, or bank accounts in Maryland. KST is not registered to do business in Maryland, does not advertise or solicit business in Maryland, does not design products for the Maryland market, and does not issue warranties to consumers in Maryland or the United States. During the period of time relevant to this lawsuit, KST did not directly sell any Karl Storz morcellators to any purchasers in Maryland or earn any revenue from any such sales.

KSEA is a wholly-owned subsidiary of KST and the exclusive marketer and distributor in the United States for KST medical products, including Karl Storz morcellators. KSEA is incorporated in and has its principal place of business in California, where it has over 500 employees, and it has a distribution facility in Massachusetts. KSEA has no offices in Maryland, but it has three sales representatives assigned to the state. KSEA sold the morcellator used in Daley's surgery to Holy Cross Hospital. Based on these facts, KSEA has conceded that this Court has personal jurisdiction over it in this action.

KSEA was created for the purpose of distributing Karl Storz products to the United States market. KST sought to have KSEA distribute its morcellators in the entire United States, without specifically targeting or excluding any particular states. Although there is no written distribution or exclusivity agreement between the two companies, KST generates an invoice for each morcellator or other KST product sold to KSEA for resale, which KSEA pays. KST sets the price that KSEA pays, but KSEA sets the prices paid by end users. KSEA also sells ancillary products that work in tandem with the Karl Storz equipment but does not distribute any products that cannot be combined with KST products.

At the time of the events in this case, KSEA's Board of Directors consisted of Dr. Sybill Storz, who was at the same time KST's Managing Director, and Karl-Christian Storz, Dr. Storz's son. Although Dr. Storz would have input in the selection of the President of KSEA, she is not consulted on KSEA hiring or promotion decisions. Some employees have transferred between KST and KSEA, including KSEA's Vice President of Marketing, who formerly worked for KST.

KSEA's day-to-day affairs are managed by its Executive Committee. At the time of the events at issue in this case, neither Dr. Storz nor any KST employee was on KSEA's Executive Committee. Members of the Executive Committee typically meet with KST executives during

annual and mid-year business planning meetings to discuss product pipelines, product focus, and revenue objectives.

KSEA maintains its own internal corporate departments, including for accounting, finance, human resources, marketing, sales, taxation, and regulatory affairs. KSEA has its own standard operating procedures for its day-to-day operations. KSEA does, however, provide KST with its annual budget, monthly financial performance reports, and its revenue and cash flow projections.

KSEA, not KST, conducts all advertising and distribution of KST products in the United States. KSEA and KST do not share advertising expenses. However, KST provides marketing materials for its products and, as with all of its subsidiaries, requires KSEA to adhere to Brand Identity Guidelines, which dictate the look of various advertising and promotional materials. KST also prepares labels, technical specifications, and use instructions for all of its products, which are then modified as necessary by KSEA to bring them into compliance with United States Food and Drug Administration ("FDA") requirements. In the event of a complaint about a KST product, both KST and KSEA are made aware, and KST may investigate the root cause of the complaint while KSEA works with the FDA to ensure the products remain in regulatory compliance. KSEA issues the warranty on KST products sold in the United States and would thus reimburse a customer for a defective product, then seek reimbursement from KST if appropriate under KST's manufacturer's warranty. KSEA also services or repairs KST products sold in the United States, and if KSEA is unable to repair a product without sending it to KST in Germany, it typically sends the customer a replacement product. Although there is no formal servicing agreement, KSEA may then send the original product to KST for repair, but it does not typically return the repaired item to the customer. In the event of a verdict or settlement in a

product liability suit based on a KST product, any monetary award would first be paid by KSEA's insurance policy, with KST's global product liability policy tapped only if the KSEA policy were insufficient.

**DISCUSSION**

KST moves to dismiss the claims against it for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), based on its assertion that it lacks sufficient contacts with Maryland to be subject to this Court's jurisdiction. Plaintiffs oppose the Motion, arguing that KST is subject to this Court's jurisdiction by virtue of its relationship with KSEA. Specifically, Plaintiffs contend that KST exerts sufficient control over KSEA to warrant imputing to KST the contacts that KSEA has with Maryland, which the parties agree are sufficient to support personal jurisdiction.

**I.  Legal Standard**

When a defendant seeks dismissal pursuant to Rule 12(b)(2), a plaintiff is required at the pleading stage to make only a *prima facie* showing that the defendant is properly subject to the court's jurisdiction. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). In such instances, the Court takes the facts set forth in the complaint as true and draws all reasonable inferences in the plaintiffs' favor. *Id.* at 60. However, if a plaintiff is permitted to take jurisdictional discovery, the Court may require a more stringent showing, requiring the plaintiff to establish jurisdiction by a preponderance of the evidence. *Boit v. Gar-Tec Prod., Inc.*, 967 F.2d 671, 676-78 (1st Cir. 1992); *see Burns & Russell Co. of Balt. v. Oldcastle, Inc.*, 198 F. Supp. 2d 687, 689 (D. Md. 2002) (relying on *Boit* to require a plaintiff who was permitted jurisdictional discovery to establish jurisdiction by substantial evidence).

In assessing whether personal jurisdiction exists, the court applies the law of the forum state, in this case, Maryland. *See Mylan Labs.*, 2 F.3d at 61 (applying Maryland law to the question whether there is personal jurisdiction over a parent company based on a subsidiary's contacts with Maryland under an agency theory); *Burns & Russell*, 198 F. Supp. 2d at 9 ("The law of the forum state determines whether the corporate veil should be pierced to exercise personal jurisdiction over a non-resident defendant."). *See generally Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 778 (1984) (noting that a choice of law question "presents itself in the course of litigation only after jurisdiction ... is established and we do not think such choice of law concerns should complicate or distort the jurisdictional inquiry").

## II. Personal Jurisdiction

KST is incorporated and headquartered in Germany and thus is not a citizen of Maryland. Accordingly, for this Court to find personal jurisdiction over KST, Plaintiffs must make the necessary showing that KST is subject to suit under both the long-arm statute of Maryland and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Because courts have interpreted the Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103 (West 2011), to reach as far as the Constitution allows, the statutory and due process components of the personal jurisdiction analysis merge. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

The due process analysis requires a showing that KST has sufficient "minimum contacts" with Maryland such that "maintenance of the suit [in this state] does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Personal jurisdiction can be "general" or "specific." A court has general personal

jurisdiction when the defendant maintains "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). Here, as the parties do not dispute, KST lacks the continuous and systematic contacts with Maryland that would enable this Court to exercise general jurisdiction.

As for specific jurisdiction, a defendant corporation must "purposefully avail[] itself of the privilege of conducting activities within the forum State," and its "conduct and connection with the forum State" must be "such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Thus, a court has specific personal jurisdiction when the defendant has established minimum contacts with the forum state by purposefully directing its activities at the residents of that state, and the cause of action "results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).

Generally, when the defendant is a non-resident company whose only alleged connection to a forum is that its products have ended up there, plaintiffs argue for personal jurisdiction on the basis of the "stream of commerce" theory. Under that theory, a forum state "does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen*, 444 U.S. at 297-98. The Supreme Court's jurisprudence on the stream of commerce theory has not been univocal. *See Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 112, 117 (1987) (advancing two different theories of stream of commerce personal jurisdiction, neither of which garnered a majority of the Court). At present, Justice Breyer's concurrence in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), a case in which no majority opinion was

issued, provides controlling guidance. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....") (citation omitted). In *McIntyre*, six justices agreed that there was no personal jurisdiction over a British manufacturer that directed marketing and sales efforts at the United States through a U.S. distributor, but whose only direct contact with the forum state, New Jersey, was the fact that one of its machines was sold into New Jersey and injured a resident of that state. *McIntyre*, 564 U.S. at 887-88. In his concurrence, Justice Breyer concluded that without a showing that the defendant had engaged in a "regular course of sales" in the forum state, or a showing of "something more," such as "special state-related design, advertising, advice, marketing or anything else" that would show a "specific effort" by the defendant to sell in the forum, the exertion of personal jurisdiction over the manufacturer would violate due process. *Id.* at 889 (Breyer, J., concurring).

Here, where the morcellator at issue was sold into Maryland by KSEA, not KST, Plaintiffs do not expressly press the claim that KST has purposefully availed itself of the right to conduct business in Maryland. Although Plaintiffs have had the opportunity for jurisdictional discovery, they have not established sales of KST morcellators into Maryland beyond the single morcellator at issue in this case, and there is no evidence that KST employed any Maryland-specific design, advertising, or marketing. To the extent that purchasers of morcellators have problems with the product, they deal only with KSEA, which issues the warranty to American purchasers. Thus, this is not a case in which the record demonstrates a "regular course of sales" into Maryland or a "specific effort" to sell into Maryland from which one could reasonably infer

that in placing its morcellators into the stream of commerce, KST could be said to have purposefully directed those products into Maryland. *Id.* (Breyer, J., concurring).

Notably, in *McIntyre*, J. McIntyre Machinery, Ltd. ("McIntyre UK"), a British manufacturer, used McIntyre Machinery America, Ltd. (McIntyre America") as its exclusive U.S. distributor to market and sell its products with the purpose and expectation that McIntyre America would sell them all across the United States without excluding any particular state, worked "closely in concert" with McIntyre America, and gave direction and guidance to McIntyre America on promotion and advertising. *McIntyre*, 564 U.S. at 897 (Ginsburg, J., dissenting). Nevertheless, because McIntyre UK had not taken steps to purposefully avail itself of the market in New Jersey specifically, the Supreme Court found no personal jurisdiction over McIntyre UK in that state. *McIntyre*, 564 U.S. at 887. Thus, even though KST engaged KSEA to sell its morcellators and other products in all 50 states without excluding Maryland, and worked closely with KSEA including by supplying marketing materials and brand guidelines, *McIntyre* dictates that KST cannot be deemed to have purposefully availed itself of the Maryland market, such that its contacts would be sufficient to establish personal jurisdiction. *See id.*; *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 946-47 (4th Cir. 1994) (holding that a cigarette filter material manufacturer's close relationship with a cigarette company which the filter material manufacturer knew would send cigarettes into Maryland fell short of establishing purposeful availment in the forum state by the manufacturer).

Instead, Caradori argues that KSEA is essentially an agent of KST and thus that this Court should impute KSEA's contacts with Maryland to KST. While KSEA is a wholly-owned subsidiary of KST and KST's exclusive importer and distributor in the United States, that relationship alone is not enough to allow KSEA's contacts with Maryland to be imputed to KST

for purposes of establishing personal jurisdiction. *See Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) ("[I]t is generally the case that the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity."); *Mylan Labs.*, 2 F.3d at 63; *Vitro Elecs., Div. of Vitro Corp. of Am. v. Milgray Elecs., Inc.*, 258 A.2d 749, 751-52 (Md. 1969) ("[A] foreign corporation is not construed as doing business within a state merely because of its ownership of all the shares of a stock of another corporation doing business in the state."). Instead, Maryland has adopted the "agency" test to determine whether to pierce the corporate veil separating a parent company from its subsidiary so as to impute the subsidiary's contacts onto the parent and grant jurisdiction. *Mylan Labs.*, 2 F.3d at 61.

Under Maryland law, the corporate veil between a parent and a subsidiary may be pierced where the parent exerts "considerable control" over the subsidiary. *Id.* Initially, KST appears to exert control over KSEA because KSEA is a wholly owned subsidiary of KST, a privately-held, family-run company, and KSEA's Board of Directors consists of two members of the Storz family: Dr. Sybill Storz, who is also the Managing Director of KST, and her son, Karl-Christian Storz. However, the fact that a parent company owns 100 percent of a subsidiary and there are overlapping directors or officers is not dispositive. *See Vitro Elecs.*, 258 A.2d at 751-53 (finding no cause to pierce the corporate veil for purposes of jurisdiction even though the parent company, Milgray Electronics, Inc., owned 100 percent of the stock of the subsidiary, Milgray/Washington, Inc., and the officers of both corporations were the same); *see also Mylan Labs.*, 2 F.3d at 63 (holding that 100 percent ownership of the subsidiary does not by itself establish an agency relationship); *Call Carl, Inc. v. BP Oil Corp.*, 391 F. Supp. 367, 371 (D. Md. 1975) (stating that even when the parent company owns all of the subsidiary's stock and there are interlocking directorships, if the subsidiary keeps its own books and makes its own policy,

marketing, and management decisions, the totality of the relationship must be considered to determine the level of control over the subsidiary). Rather, for purposes of determining whether to pierce the corporate veil, the parent company's level of control is evaluated based on a number of factors, including whether the parent company must approve significant decisions of the subsidiary, whether the companies "maintain separate books and records, employ separate accounting procedures, and hold separate directors' meetings," and the level of "interdependence between parent and subsidiary," including whether the subsidiary has "some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." *Mylan Labs.*, 2 F.3d at 61 (quoting *Harris v. Arlen Prop., Inc.*, 260 A.2d 22, 29 (Md. 1969)). Finally, imputing the contacts of the subsidiary to the parent company is appropriate only if the parent company also knew or should have known that "its conduct would have some impact in Maryland." *Id.* at 61-62. Maryland courts generally do not "break[] down observed distinctions between parent and subsidiary corporations where fraud or deception is not present." *Vitro Elecs.*, 258 A.2d at 753. *See also DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976) (stating in the context of liability rather than personal jurisdiction, that the power to pierce the corporate veil should be exercised "reluctantly" and "cautiously," with the burden of establishing a reasonable basis put upon the party asking to disregard the corporate fiction).

On the "central" issue of whether the parent company must approve significant decisions of the subsidiary, *Mylan Labs.*, 2 F.3d at 61, the case of *Finance Company of America v. BankAmerica Corp.*, 493 F. Supp. 895 (D. Md. 1980), provides an instructive example. There, the court found that the parent company, BankAmerica Corporation ("BankAmerica"), exerted control over the operations of the subsidiary, FinanceAmerica Corporation ("FinanceAmerica")

in part because BankAmerica had to approve significant decisions such as the opening of branch offices, the negotiation and execution of leases, the making of substantial loans, the acquisition of substantial assets, and the setting of the interest rates at which the subsidiary could lend money to customers. *Id.* at 907. BankAmerica also controlled FinanceAmerica's day-to-day operations by imposing guidelines set forth in its operating manual. *Id.* Moreover, the parent company directly controlled certain personnel, in that FinanceAmerica's area directors, responsible for supervising branch managers, were paid by BankAmerica and reported to a BankAmerica official, and the branch managers were employed by BankAmerica. *Id.* Subsidiary personnel participated in the parent company's insurance and pension plans. *Id.* Finally, BankAmerica provided accounting, marketing, and advertising services to the subsidiary, including by preparing advertisements distributed in Maryland for the benefit of the subsidiary. *Id.* at 907-08.

Here, by contrast, Plaintiffs have not identified evidence that KST exerts such control. Although KST and KSEA executives meet regularly, such as at twice-yearly executive meetings, to discuss product pipelines and revenue goals, KSEA, through its Executive Committee, sets its own budget and revenue projections, and KSEA sets the prices at which it sells morcellators and other products to U.S. customers. *Cf. Finance Co.*, 493 F. Supp. at 907 (considering the setting of interest rates to charge bank customers a "significant decision" for which a subsidiary bank would need parent company approval). With the possible exception of the appointment of its President, KSEA's personnel decisions are made internally, without direction from KST.

The only evidence of control by KST over KSEA's day-to-day activities is that it provides marketing materials, labels, and technical specifications for its products and requires KSEA to adhere to Brand Identity Guidelines, which dictate the appearance of certain

advertising and promotional materials. Such uniformity requirements do not alone establish an agency relationship. *See Price v. Waste Mgmt., Inc.*, No. ELH-13-02535, 2014 WL 1764722, at *12 (D. Md. 2014) (holding that a shared logo does not confer jurisdiction over a foreign parent company). Notably, KSEA modifies materials to comply with FDA regulatory guidance and conducts its own advertising through its own advertising budget. There is no evidence that KST controls KSEA's marketing strategy, particularly its decisions on what states to focus on and where to deploy its marketing personnel. KSEA also issues the warranties on the products it sells and either repairs or replaces products returned for alleged warranty violations. Thus, the evidence shows that KSEA makes enough significant decisions and operates its distribution activities with sufficient independence that it cannot be said that KSEA is "under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." *Mylan Labs.*, 2 F.3d at 61.

As to the second factor of corporate formalities, KST and KSEA have generally observed them. The companies maintain separate books and records, and KSEA has a staff of 500 employees at its California headquarters with its own corporate departments for accounting, finance, human resources, marketing, sales, taxation, and regulatory affairs. Although it is not clear whether the KSEA Board of Directors has held formal meetings, the Board has taken formal action on a number of matters, such as electing certain executive officers, approving capital contributions, declaring dividends, authorizing the obtaining of credit, and approving changes to KSEA's benefit and bonus plans.

The third factor of interdependence weighs in favor of Plaintiffs because KSEA's existence is almost entirely dependent on KST. Over 90 percent of KSEA's sales are of KST devices, and the remaining sales are of products used in conjunction with KST products. The

fact that KSEA lacks any written distribution, exclusivity, or servicing agreements with KST renders KSEA entirely dependent on KST to decide whether and at what price KST will provide products to KSEA and repair them if necessary. At the same time, however, KSEA has a separate purpose that is distinct from, though related to, that of KST: KST manufactures products, while KSEA distributes them. Courts have declined to pierce the corporate veil for purposes of jurisdiction where the subsidiary serves a distinct but related function. *Compare Vitro Elecs.*, 258 A.2d at 750-53 (declining to pierce the corporate veil to establish personal jurisdiction over parent company Milgray Electronics, Inc., an electronic parts supplier, where the wholly owned subsidiary Milgray/Washington, Inc., sold parts it received from the parent company to the plaintiff) *and Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 723 (D. Md. 2000) (declining to pierce the corporate veil to establish personal jurisdiction over parent company Bell Atlantic Corporation where the subsidiary Verizon Wireless was deemed to have a "separate purpose") *with Harris v. Arlen Prop., Inc.*, 260 A.2d 22, 31 (Md. 1969) (finding that where a subsidiary's sole purpose was to hold title for the parent company, piercing of the corporate veil was warranted). Where the subsidiary is not fraudulently incorporated or undercapitalized, the fact that the subsidiary's business is interconnected with the parent company's business does not alone provide a basis to pierce the corporate veil. *See Newman*, 125 F. Supp. 2d at 723.

Particularly where the evidence does not establish that KSEA's significant decisions must be approved by KST; KSEA conducts its day-to-day activities, including its marketing, advertising, and distribution, largely on its own; and KSEA maintains corporate formalities such as having separate books and records and business departments, the Court concludes that Plaintiffs have not established a basis to pierce the corporate veil and attribute KSEA's contacts

with Maryland to KST for jurisdictional purposes. *See Mylan Labs.*, 2 F.3d at 62 (declining to pierce the corporate veil where the parent company did not exert any control over the marketing, purchasing, pricing, management, or operating policies of the subsidiary, and the subsidiary maintained separate books and records, formed its own contractual relationships, and had its own facilities, personnel, and managing executives); *Newman*, 125 F. Supp. 2d at 723 (declining to pierce the corporate veil even when the parent company could appoint a majority of the subsidiary's board of directors, the two companies used consolidated financial statements and tax returns, and the parent company had to approve certain decisions such as acquisitions and dispositions, because the subsidiary was a separate corporate entity with own financial records and purpose, and there was no allegation that subsidiary was merely a sham company).

*Gourdine v. Karl Storz Endoscopy-America, Inc.*, 223 F. Supp. 3d 475 (D.S.C. 2016), a case stemming from the same alleged morcellator defects and in which the United States District Court for the District of South Carolina found that it had personal jurisdiction over KST, does not alter this conclusion. In that case, the Court applied California law, which considers a wider variety of factors in assessing whether to impute a subsidiary's contacts to a parent company, and under which "[e]quity is the most important consideration" in whether to pierce the corporate veil. *Id.* at 491. This Court has reached its personal jurisdiction determination under Maryland law, whose strictures are more demanding. *See Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004) ("Maryland generally is more restrictive than other jurisdictions in allowing plaintiff to pierce the corporate veil."). Likewise, KSEA's prior patent infringement suit, which it filed as a plaintiff in this Court, does not change the result. That case was filed in 1998, well before the events at issue in this case. *See Karl Storz Endoscopy-America, Inc. v. Fiber Tech Med., Inc.*, No. WMN-98-0869 (D. Md.

filed Mar. 24, 1998). Even if the filing of that prior suit could be taken as an enduring consent to this Court's jurisdiction, such consent would apply only to KSEA, because KST was not a party to that action.

Finally, the evidence fails to demonstrate that exerting personal jurisdiction over KST is necessary to ensure fair play and substantial justice, which could justify a finding of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *See Burger King*, 471 U.S. at 477. In evaluating the reasonableness of a jurisdictional determination, courts should consider the difficulty a defendant would suffer by defending a suit in the forum state, the forum state's interest in adjudication of the issue, the plaintiff's interest in obtaining convenient and effective relief, and the interests of the interstate judicial system in efficient resolution of controversies. *See id.* Although exerting jurisdiction would burden KST by requiring it to defend itself in a foreign country under foreign law, the Court does not find that this factor weighs heavily against jurisdiction. While KST has escaped a finding of personal jurisdiction because *McIntyre* requires purposeful availment directed at the forum state specifically rather than at the national market generally, and the Maryland test for piercing the corporate veil does not allow for a finding of agency, the Court otherwise sees no unfairness in requiring KST to defend in Maryland. KST directed KSEA to seek customers throughout the United States and has derived financial benefit from sales in Maryland, such that it could reasonably expect to be required to answer in Maryland for alleged defects of its product. If anything, there is potential unfairness in allowing a foreign manufacturer to avail itself of American markets without having to face liability in the states where its customers reside. Likewise, there is unfairness to Plaintiffs in not being able to bring an action in Maryland for foreseeable harms occurring in this state, and Maryland has an interest in ensuring that its citizens have such recourse.

Nevertheless, this is not a case in which the subsidiary is insolvent or undercapitalized. KSEA has acknowledged that any products liability judgment would be paid first by KSEA's insurance policy and then, if necessary, by KST's global insurance policy. Where Plaintiffs' potential recovery is not discernibly circumscribed by permitting the case to proceed against KSEA only, fair play and substantial justice do not require the Court to exert personal jurisdiction over KST upon a lesser showing of minimum contacts than would ordinarily be required. KST's Motion to Dismiss will therefore be granted.

## CONCLUSION

For the foregoing reasons, KST's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED. A separate Order shall issue.

Date: September 18, 2017

THEODORE D. CHUANG
United States District Judge